UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA


MWATI MCKENZIE,                                    CIVIL NO. 07-4441 (PAM/JSM)

        Plaintiff,

v.                                                 REPORT AND RECOMMENDATION

JOAN FABIAN, Commissioner
of Corrections,
LYNN DINGLE, Chief Correctional Officer, and
MARY MACOMB, Associate Warden of
Administration
In their individual or personal
capacities

        Defendants.

JANIE S. MAYERON, United States Magistrate Judge

        The above matter comes before the undersigned upon defendants' Motion for

Summary Judgment [Docket No. 19].  This matter has been referred to the undersigned

Magistrate Judge for a Report and Recommendation by the District Court pursuant to

28 U.S.C. § 636(b)(1)(B) and Local Rule 72.1(c).

## I.    BACKGROUND

        Plaintiff is currently confined at the Minnesota Correctional Facility – Oak Park

Heights.  Complaint, ¶ 3 [Docket No. 1].

        The facts underlying this action are as follows: Plaintiff was convicted of first-

degree murder of Minneapolis police officer Jerry Haaf in October 1993 and sentenced

to life imprisonment.  See State v. McKenzie, 532 N.W. 2d 210, 212 (Minn. 1995).  On

March 2, 2006, plaintiff filed a civil malpractice action against his criminal defense

attorney.  Complaint, Ex. L (Negligence and Legal Malpractice Complaint in the matter

of McKenzie v. McGlennen, Case No. 27-CV-06-4832, Hennepin County District Court, State of Minnesota). On March 21, 2007, summary judgment was granted in favor of the defendant in the civil case, and on April 26, 2007 plaintiff appealed the decision to the Minnesota Court of Appeals. Complaint, Ex. A (Order of Minnesota Court of Appeals dated May 8, 2007 in the matter of McKenzie v. McGlennen, A07-857 (hereafter referred to as the "state appeal")); Affidavit of Angela Behrens ("Behrens Aff."), Ex. 1 (Notice of Appeal dated April 25, 2007).

Effective May 1, 2007, the Minnesota Department of Corrections ("MNDOC") instituted a new mail policy limiting the weight of individual pieces of non-legal incoming mail to sixteen ounces. Affidavit of Mary McComb ("McComb Aff."), ¶ 3; Ex. 2 (MNDOC Directive 302.020). Revised MNDOC Directive 302.020 was issued on April 3, 2007. McComb Aff., Ex. 2. MNDOC Directive 302.020 E.2(b)) provides that if an item exceeded sixteen ounces, mailroom staff will return it, unopened, to the sender and will notify the sender of the reason for non-delivery.[1] Id. MNDOC Directive 302.020.G.1 states that "Notices of non-delivery will not be sent for unopened mail that was returned to the sender." Id.; see also Affidavit of Mwati McKenzie ("McKenzie Aff.") dated June 25, 2009, ¶ 14 ("Inmates do not receive any notice, nor do they receive any evidence (receipt) that the incoming mail, did in fact, weigh over sixteen ounces.") [Docket No. 48].

---

[1] MNDOC Directive 302.020 E.2(b) states:

For security purposes, incoming mail is limited to 16 ounces per item to permit timely processing and thorough inspection. Items in excess of this limit will be returned to sender unopened with an explanation for the rejection.

So long as the incoming mail is non-legal, the weight limit is enforced without regard to the content of the mail and applies only to an individual envelope. McComb Aff., ¶¶ 3, 7. This policy does not apply to legal mail; that is, MNDOC imposes no weight limit on incoming legal mail. McComb Aff., ¶ 8. Legal mail is defined as "correspondence to or from court and court staff, attorneys and established groups of attorneys involved in the representation of offenders in judicial proceedings." Id. Legal mail is determined by the relationship between the sender and the inmate. Id. Simply marking "legal mail" on an envelope is insufficient, and the contents of an envelope will not automatically render mail, legal mail. Id. If an inmate chooses to have a family member or friend assist in legal matters, the only restriction is that the mail sent to the inmate not exceed sixteen ounces. McComb Aff., ¶ 9. To send non-legal mail weighing over sixteen ounces to an inmate, the sender could divide it into separate envelopes weighing less than sixteen ounces each. McComb Aff., ¶ 7.

On May 8, 2007, the Minnesota Court of Appeals entered an order directing plaintiff to correct certain filing deficiencies in his appeal, and to supply the court with copies of various documents and his appellate brief on or before June 4, 2007. Complaint, pp. 2-3; Ex. A (Order of Minnesota Court of Appeals dated May 8, 2007 in the state appeal); Behrens Aff., Ex. 2 (same).

At plaintiff's request, on May 29, 2007, the Minnesota Court of Appeals entered an order granting plaintiff an extension of time to file his brief until June 15, 2007. Behrens Aff., Ex. 3 (Order of Minnesota Court of Appeals dated May 29, 2007 in the state appeal). The basis for plaintiff's request for an extension was that he was incarcerated, and that the filing of his brief had been delayed because he was not

allowed to receive the copies of his brief, due to a restriction on the weight of incoming mail.  Id., p. 1.

Plaintiff again moved for an extension of time in which to file his brief, and on June 12, 2007, was granted until June 29, 2007 to file his brief.  Behrens Aff., Ex. 4 (Order of the Minnesota Court of Appeals dated June 12, 2007 in the state appeal).

On June 19, 2007, plaintiff requested and the Minnesota Court of Appeals allowed an outside party to serve and file his briefs based on plaintiff's representation that he was unable to do it himself as the original and copies of his brief were not accepted at his correctional facility due to the limitation on the weight of incoming mail that he could receive.  Behrens Aff., Ex. 5 (Order of the Minnesota Court of Appeals dated June 21, 2007 in the state appeal).  Plaintiff was given until June 29, 2007 to file the briefs.  Id.

After plaintiff again failed to file his brief by the extended deadline of June 29, 2007, the Minnesota Court of Appeals entered an order on July 11, 2007, affording plaintiff a final opportunity to correct the deficiencies in his appeal and gave him until July 23, 2007 to file copies of his brief and the judgment.  Behrens Aff., Ex. 6 (Order of the Minnesota Court of Appeals dated July 11, 2007 in the state appeal).  On August 2, 2007, when plaintiff still had not filed his brief and the judgment, the Minnesota Court of Appeals dismissed the appeal, noting that it appeared that the appeal had been abandoned.  Behrens Aff., Ex. 7 (Order of the Minnesota Court of Appeals dated August 2, 2007 in the state appeal).

On May 31, 2007, plaintiff filed an informal grievance with defendant Mary McComb, Associate Warden of Administration, informing her that on June 21, 2007

[sic],[2] he had been informed by the mailroom that his incoming legal mail was rejected and returned to the sender due to "a D.O.C. Policy that stipulates inmates cannot receive mail over 16 oz. in weight." Complaint, p. 3; Ex. C (Offender Kite Form dated May 31, 2007 and response dated June 4, 2007 and Informal Grievance dated May 31, 2007); McComb Aff. ¶ 11, Ex. 4 (same). Plaintiff stated that as a result of MNDOC Directive 302.020 E.2(b), he had filed and received an extension to June 15, 2007 to file his brief with the Minnesota Court of Appeals. Id. Plaintiff requested information regarding the mail procedures and information as to how mail that weighed over sixteen ounces was processed in the mail room so that he could successfully file his briefs. Id. On June 4, 2007, McComb responded to plaintiff's informal grievance, stating that legal mail was either to or from an attorney or court, and that while plaintiff had not stated who mailed him the rejected package, it was not from an attorney or court. Id. McComb also stated that simply writing "legal mail" on an envelope did not exempt it from the weight limit. Id.

On June 11, 2007, plaintiff sent a request to McComb and John King, Associate Warden at the time, asking for reconsideration of the informal grievance. Complaint, pp. 3-4; Ex. D (Offender Kite Form dated June 11, 2007 with response dated June 12, 2007); McComb Aff. ¶ 12, Ex. 6 (same). Plaintiff more specifically laid out the

---

[2]      Plaintiff refers to June 21, 2007 as the date his mail was rejected. However, because many of plaintiff's written complaints and kites included as exhibits to his Complaint regarding that incident pre-date June 21, 2007, the Court believes the June 21 date to be a typographical error and presumes that he was given notice of the rejection of his mail some time prior to May 31, 2007, the date he filed his first grievance, if not some time before May 29, 2007, which was the date the Minnesota Court of Appeals granted plaintiff his first extension to file his briefs and judgment. See Complaint, Exs. C-G; Affidavit of Mwati McKenzie dated June 25, 2009, ¶ 5 [Docket No. 48]; Behrens Aff., Ex. 3 (Order of Minnesota Court of Appeals dated May 29, 2007 in the state appeal).

circumstances of his situation and told McComb and King that the mail was from his family, who had copied the briefs for him so he could send them to the Court of Appeals, and that he would like information on how to properly obtain copies of his briefs through the mail room. Id. On June 12, McComb responded and told plaintiff that he could have legal copies made at the facility for 25 cents per page, and that if he sent out materials to be copied, the returning packages had to be under 16 ounces unless they came from an attorney. Id. King told plaintiff that he would defer to McComb. McComb Aff., ¶ 12, Ex. 6 (copy of June 11, 2007 kite to King and King's response dated June 13, 2007).

On June 13, 2007, plaintiff sent another kite to McComb and informed McComb that he did not have money to make the copies at the facility and asked for an exception so that he could file his brief with the Minnesota Court of Appeals. Complaint, pp. 4-5; Ex. E (Offender Kite Form dated June 13, 2007); McComb Aff., ¶ 13, Ex. 7 (copy of kite and response). In response, McComb responded that only legal mail was exempt from the policy and suggested plaintiff have packages sent to him in smaller packages which "speeds up the process because they are easier to search." McComb Aff., ¶ 13, Ex. 7.

On June 14, 2007, plaintiff sent a kite to McComb and informed McComb that he had broken down his legal briefs into six different smaller packages of two to three 20-page briefs totaling about 60 pages, and that they were again rejected. Complaint, pp. 4-5; Ex. F (Offender Kite Form dated June 14, 2007); McComb Aff., ¶ 14, Ex. 8 (copy of kite and response). On June 19, 2007, McComb responded to plaintiff's complaint, explaining that the 16-ounce weight limit would not be compromised due to concerns of security and smuggling of contraband. Complaint, p. 5; Ex. G (Memorandum from

McComb to plaintiff dated June 19, 2007); McComb Aff., ¶ 14, Ex. 8. McComb informed plaintiff that if a person was using standard copy paper of a 20-pound weight, there are 100 sheets to a pound. Complaint, Ex. G; McComb Aff., Ex. 8. She also stated that one must include the weight of the envelope, but that one could still get 40-60 pages of copied material into an envelope for less than a pound. Id. Additionally, McComb informed plaintiff that padded envelopes present an issue because inmates have used padded envelopes to conceal contraband, and that plaintiff's mail should go through in a regular, non-padded envelope that weighs less than 16 ounces. Id. McComb further explained that the mail policy defined legal mail as to or from a court or an attorney, that marking "legal mail" on an envelope not coming from a court or attorney would only raise suspicion regarding that envelope, and that exceptions could not be made on mail restrictions simply because the term "legal mail" appeared on the outside of the envelope. Complaint, Ex. G; McComb Aff., Ex 8.

Sometime after King's June 13, 2007 response to plaintiff's June 11, 2007 kite, plaintiff sent an additional kite to King asking who would review McComb's decision. McComb Aff., ¶ 15, Ex. 9 (copy of plaintiff's undated kite to King and King's response). King informed plaintiff that Lynn Dingle, then Warden of MCF-STW, would be the person to review McComb's decision. Id.

On July 10, 2007, plaintiff filed a formal grievance with Dingle regarding the actions of McComb, and asking that "non-posted" policy 302.020E.2(b) be modified or repealed so that inmates like himself could receive items of a legal nature. Complaint., p. 6; Ex. I (Offender Grievance dated July 10, 2007 and Response dated July 17, 2007); McComb Aff., ¶ 16, Ex. 10 (copy of grievance and decisions of Dingle and Skon). In

support of his request for removal or repeal of the policy, plaintiff reasoned that the responses of the associate wardens to his kites and grievances did not establish that the receiving of legal materials were more likely to serve a vehicle for the introduction of contraband into the prison; that there were no reasonable alternative means available to him or other inmates to receive items of a legal nature; that there was no basis to conclude from the responses that receiving the materials had any material impact upon guards, other inmates, or the allocation of prison resources; and that the associate wardens refused to accept an alternative proposal and refused to propose a ready alternative to the solution of MDOC Policy 203.020. Id.

On July 17, 2007, Dingle denied the grievance, finding that the mail room correctly applied the policy restricting incoming mail to sixteen ounces, and that plaintiff was free to make a recommendation to change the policy and forward it to the facility policy coordinator. Complaint, Ex. I; McComb Aff. ¶ 16, Ex. 10. Erik Skon, the Assistant Commissioner for Facility Services, affirmed Dingle's decision. McComb Aff., ¶ 16, Ex. 10.

On July 22, 2007, plaintiff filed a grievance appeal, appealing the denial of his request that the new policy should be modified or appealed because it interfered with inmates receiving items of a legal nature or other legal documents, and it only applied to mail that was over sixteen ounces, as opposed to other items that exceeded the 16-ounce weight limit such as magazines, photos, newspapers, books, and the like. Complaint, p. 6; Ex. J (Grievance Appeal dated July 22, 2007). On August 2, 2007, plaintiff's grievance appeal was denied by Eric Skon. Id.; Ex. K (grievance appeal response dated August 2, 2007); McComb Aff., Ex. 10 (same).

On November 1, 2007, plaintiff instituted this action against defendants in the "individual or personal capacities" under 42 U.S.C. § 1983. In this suit, plaintiff alleged that the denial of his right to receive legal documents or mail violated his rights under the Fourteenth Amendment because it constituted a denial of access to the courts. Complaint, ¶ 19. Plaintiff also alleged that the same denial of rights constituted a denial of plaintiff's right to receive mail in violation of the First Amendments to both the United States Constitution and the Minnesota Constitution. Id., ¶ 20. Accordingly, plaintiff requested relief in the form of a declaration that the acts of the defendants violated his rights under the Constitution and laws of the United States, a preliminary and permanent injunction repealing MNDOC Directive 302.020 E.2, compensatory damages in the amount of $500.00 against each defendant jointly, and punitive damages in the amount of $150,000 against each defendant jointly, representing the amount of punitive and compensatory damages sought in the civil action of McKenzie v. McLennan. Id., pp. 7-8; Ex. L (Negligence and Malpractice Complaint in the matter of McKenzie v. McGlennen, Fourth Judicial District Court, State of Minnesota).

On October 1, 2008, defendants moved for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. [Docket No. 19]. On June 29, 2009, plaintiff served and filed his response to the motion. [Docket No. 47].[3]

---

[3]  Plaintiff asked for and received two extensions to respond to defendants' motion, but never filed a response. Instead, almost two months after the last extension, he moved to voluntarily dismiss his Complaint without prejudice. Defendants opposed this motion, but did not oppose a final extension for plaintiff to respond to the summary judgment motion. On June 9, 2009, this Court issued a Report and Recommendation recommending denial of plaintiff's motion to voluntarily dismiss his Complaint without prejudice, and giving plaintiff until July 3, 2009 to serve and file his response to defendants' summary judgment motion. See Report and Recommendation dated June 9, 2009 [Docket No. 42].

## II.    ANALYSIS

Defendants motion for summary judgment is based on four grounds: 1) plaintiff cannot establish that the MNDOC's mail policy denied him a constitutional right of access to the courts; 2) MNDOC's mail policy does not violate the First Amendment; 3) plaintiff failed to allege personal involvement by defendants Fabian and Dingle; and 4) plaintiff is not entitled to damages because he cannot recover money damages from the State, and even if he could establish a constitutional violation, all defendants are entitled to qualified immunity. Def. Mem., pp. 5-17.

In response, plaintiff contended that MNDOC's mail policy did not give him proper notice and violated his right to receive mail, and that he had alleged personal involvement by all of the defendants, he was entitled to the relief he seeks, and defendants were not entitled to qualified immunity. Pl. Opp. Mem. pp. 2-8.

Defendants' reply reiterated that MNDOC had constitutionally applied its mail policy to plaintiff, that plaintiff failed to allege personal involvement by two of the defendants, and that all defendants w ere entitled to Eleventh Amendment immunity and qualified immunity. Def. Reply, pp. 2-8.

### A.    Standard of Review

Summary judgment is proper if, drawing all reasonable inferences favorable to the non-moving party, there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249-50 (1986); see also Unigroup, Inc. v. O'Rourke Storage & Transfer Co., 980 F.2d 1217, 1219 (8th Cir. 1999). "'Only disputes over facts that might affect the outcome of

the suit under the governing law will properly preclude the entry of summary judgment.'" DePugh v. Smith, 880 F. Supp. 651, 656 (N. D. Iowa 1995) (quoting Anderson, 477 U.S. at 248).

The party moving for summary judgment bears the burden of showing that the material facts in the case are undisputed. Celotex Corp., 477 U.S. at 322-23; see also Mems v. City of St. Paul, Dep't of Fire & Safety Servs., 224 F.3d 735, 738 (8th Cir. 2000). If the moving party has carried its burden, the non-moving party must demonstrate the existence of specific facts in the record that create a genuine issue for trial. Anderson, 477 U.S. at 256; Krenik v. County of LeSueur, 47 F.3d 953, 957 (8th Cir. 1995). "The nonmoving party may not rest on mere allegations or denials, but must show through the presentation of admissible evidence that specific facts exist creating a genuine issue for trial." Minnesota Laborers Health & Welfare Fund v. Swenke, 2003 U.S. Dist. LEXIS 11439, *4-5 (D.Minn. 2003) (citations omitted). The non-moving party "must substantiate his allegations with sufficient probative evidence that would permit a finding in [their] favor based on more than mere speculation, conjecture, or fantasy." Wilson v. Int'l Bus. Mach. Corp., 62 F.3d 237, 241 (8th Cir. 1995).

**B.    Discussion**

In his Complaint, plaintiff alleged denial of his legal documents and to receive his mail constituted a denial of access to the courts under the Fourteenth Amendment and a violation of the First Amendment. Complaint, ¶¶ 19-20.[4]

---

[4]    In his opposition brief, plaintiff stated:

Plaintiff will not respond to defendant's [sic] contention that he was denied access to court. Plaintiff only alleged in his complaint, that defendant's [sic] denied his right to receive mail under USCA 1.

"It is now established beyond doubt that prisoners have a constitutional right of access to the courts," and this access to the courts must be "adequate, effective, and meaningful." Bounds v. Smith, 430 U.S. 817, 821-22 (1977); see also Lewis v. Casey, 518 U.S. 343, 351 (1996) ("Insofar as the right vindicated by Bounds is concerned, "meaningful access to the courts is the touchstone,"") (citation omitted). As defendants acknowledge, this right of access requires "some ability to mail complaints and related legal correspondence." Def. Mem., p. 6 (citing Myers v. Hundley, 101 F.3d 542, 544 (8th Cir. 1996)).

"Access to the courts is a constitutional right whose basis is unsettled." Earl v. Fabian, 556 F.3d 717, 726 (8th Cir. 2009) (citing Scheeler v. City of St. Cloud, Minn., 402 F.3d 826, 830 (8th Cir. 2005) (citing Christopher v. Harbury, 536 U.S. 403, 415, 122 S.Ct. 2179, 153 L.Ed.2d 413 (2002)). The right of access to the courts may be derived from the First Amendment; it may also be grounded in the Fourteenth Amendment Equal Protection and Due Process clauses. See Scheeler, 402 F.3d at 830-31; Schrier v. Halford, 60 F.3d 1309, 1311 n.3 (8th Cir. 1995) ("Although "[t]he Court's opinion in Bounds is silent as to the source of [the right of access to the courts], ... on other occasions the Supreme Court has said variously that it is founded in the Due Process Clause of the Fourteenth Amendment, ... or the Equal Protection Clause, ... or the First Amendment right to petition for a redress of grievances.") (citation omitted). "[T]he right of meaningful access to the courts ensures that prison officials may not erect

Pl. Opp. Mem., p. 1 n. 1. Taken on its face, it appears that plaintiff is no longer pursuing an access-to-courts claim. However, as the Complaint before the Court explicitly stated an access-to-courts cause of action (it was handwritten by plaintiff in paragraph 19 of the Complaint), the Court will proceed to address defendants' motion for summary judgment on this claim.

unreasonable barriers to prevent prisoners from pursuing or defending all types of legal matters." Id., at 1313.

> In Scheeler we concluded that a right to access the courts can be derived from the First Amendment. To prevail under the First Amendment a claimant typically bears the burden of proving that the defendants intentionally restricted his access to the courts. *** On the other hand, "due process requires, at a minimum, that absent a countervailing state interest of overriding significance, persons forced to settle their claims of right and duty through the judicial process must be given a meaningful opportunity to be heard." Boddie v. Connecticut, 401 U.S. 371, 377, 91 S.Ct. 780, 28 L.Ed.2d 113 (1971).

Earl, 556 F.3d at 726-27.

Regardless of the source of an access-to-courts claim, the prisoner must show actual injury. See Lewis, 518 U.S. at 349 (in a case in which inmates alleged an a denial of access to the courts under the First, Sixth and Fourteenth Amendments, the Supreme Court stated the "requirement that an inmate alleging a violation of Bounds must show actual injury derives ultimately from the doctrine of standing, a constitutional principle that prevents courts of law from undertaking tasks assigned to the political branches") (citation omitted); Myers v. Hundley, 101 F.3d 542, 544 (8th Cir. 1996) ("Alleging theoretical inadequacies is insufficient. Inmates must instead show, for example, that a complaint that they prepared was dismissed due to a technical requirement that a library's inadequacies prevented them from knowing, or that a library was so inadequate that it prevented them from filing a complaint for actionable harm at all.") (citation omitted); Beck v. Pawlenty, 2006 WL 2506993 at *5 (D.Minn. Aug. 29, 2006) ("For a violation of due process based on denial of access to the courts, a prisoner must show an actual injury. To do so, the prisoner is required to demonstrate that, as a result of the conduct of prison staff, the prisoner was denied the opportunity to

prosecute a claim. It is insufficient to show that this conduct made litigation inconvenient. Instead the prisoner must show that this conduct actually prevented the prisoner from litigating the claim.") (citing <u>Cody v. Weber</u>, 256 F.3d 764, 767-68 (8th Cir. 2001); <u>Myers</u>, 101 F.3d at 544)).

       1.    <u>Right of Access to the Courts Based on the Fourteenth Amendment</u>

Defendants argued that plaintiff cannot establish that the MNDOC's mail policy denied him a constitutional right of access to the courts. First, defendants pointed out that plaintiff's appeal to the Minnesota Court of Appeals did not challenge his conviction, sentence or conditions of confinement. Def. Mem., p. 7. Instead, the appeal was from the dismissal of a civil suit in which plaintiff sued his trial attorney for negligence and malpractice. <u>Id.</u> Therefore, according to defendants, as plaintiff had not alleged an injury challenging his conviction, sentence, or conditions of confinement, he did not have a constitutionally protected right of access to the courts. <u>Id.</u>, p. 6 (citing to <u>Lewis,</u> 518 U.S. at 354-55; <u>Cody</u>, 256 F.3d at 770). This Court disagrees.

It is true that under Supreme Court jurisprudence, a prison may not be obligated to <u>affirmatively</u> assist an inmate with the filing of a civil lawsuit unrelated to their incarceration. As the Supreme Court stated in <u>Lewis</u>:

> In other words, <u>Bounds</u> does not guarantee inmates the wherewithal to transform themselves into litigating engines capable of filing everything from shareholder derivative actions to slip-and-fall claims. The tools it requires to be provided are those that the inmates need in order to attack their sentences, directly or collaterally, and in order to challenge the conditions of their confinement. Impairment of any other litigating capacity is simply one of the incidental (and perfectly constitutional) consequences of conviction and incarceration.

<u>Lewis</u>, 518 U.S. at 355. However, that does not mean that a prison may erect barriers that prevent inmates from exercising their right to access to the courts in an unrelated

civil matter, or that prisoners have no constitutionally protected right to litigate an unrelated civil matter without prison intervention. For example, after Lewis was decided, the Eighth Circuit determined that the following circumstances stated viable right-to-access-to-the-courts claims, yet the cases did not appear to involve challenges to the inmate's conviction, sentence or conditions of confinement: a policy that prevented an inmate from obtaining his legal papers from his jailhouse lawyer upon the latter's transfer, (Goff v. Nix, 113 F.3d 887, 892 (8th Cir.1997)); the search, confiscation and reading of an inmates legal mail and papers, (Cody, 256 F.3d at 769); and a program that required inmates to use their idle-pay allowances for both personal hygiene items and postage and that lead to the dismissal of their cases because they did not have adequate funds to buy stamps to file a claim initially or to meet a deadline, (Myers, 101 F.3d at 544).[5]

---

[5]     The Court also notes that prior to Lewis, the Eighth Circuit held in a case by an inmate who had been prevented from bringing a malpractice suit against his former counsel that while Bounds did not require states to affirmatively assist prisoners on civil matters arising under state law, "[t]he right of meaningful access to the courts ensures that prison officials may not erect unreasonable barriers to prevent prisoners from pursuing or defending all types of legal matters." Schrier, 60 F.3d at 1312 (relying on John L. v. Adams, 969 F.2d 228 (6th Cir.1992), and Knop v. Johnson, 977 F.2d 996, (6th Cir.1992), cert. denied, 507 U.S. 973, 113 S.Ct. 1415, 122 L.Ed.2d 786 (1993). The Eighth Circuit also relied on a Fifth Circuit decision, Jackson v. Procunier, 789 F.2d 307 (5th Cir.1986), which held that a prison may not "deliberately hold mail that contains a prisoner's legal documents or correspondence." Schrier, 60 F.3d at 1312 (citing to Jackson, 789 F.2d at 310-311). The reasoning in Jackson is particularly germane here:

     Recognition of the constitutional right of access to the courts, however, long precedes Bounds, and has from its inception been applied to civil as well as constitutional claims. Almost eighty years ago, in Chambers v. Baltimore & Ohio Railroad Co., the Supreme Court recognized this right of access in the context of a diversity tort suit, founding the right on the privileges and immunities clause, and stating:

Moreover, this Court would be hard pressed to find that prisons can create obstacles to an inmate's civil suit in the face of the Prisoner Litigation Rights Act ("PLRA") which explicitly permits prisoners to file civil actions in federal court unrelated to a prisoner's incarceration. See e.g. Lefkowitz v. Citi-Equity Group, Inc., 146 F.3d 609, 612 (8th Cir. 1998) ("While several courts have noted that Congress promulgated the PLRA to curtail abusive prisoner litigation…we conclude that, under the plain language of the statute, the phrase "civil action or appeal" is not limited to challenges to conditions of confinement, and encompasses the instant commercial litigation.").[6] For all of these reasons, this Court rejects defendants' first argument.

---

> The right to sue and defend in the courts is the alternative of force. In an organized society it is the right conservative of all other rights, and lies at the foundation of orderly government. It is one of the highest and most essential privileges of citizenship ... granted and protected by the federal constitution.
>
> More recently, in Boddie v. Connecticut, the Supreme Court relied on this right, founded on the Fourteenth Amendment, to prohibit states from denying access to the courts to indigents who sought a civil divorce but were unable to pay docket fees. And in Corpus v. Estelle, we held that a prisoner's "reasonable access to the courts must include access in general civil legal matters including but not limited to divorce and small claims."

Jackson, 789 F.2d at 311 (citations omitted).

[6]     As the court observed in Lefkowitz:

> As amended by the PLRA, 28 U.S.C. § 1915(a)(2) provides that "[a] prisoner seeking to bring a civil action or appeal a judgment in a civil action or proceeding without prepayment of fees or security therefor ... shall submit a certified copy of the trust fund account statement." Section 1915(b)(1) further provides that a prisoner who brings "a civil action or files an appeal" IFP is required to pay the full amount of the filing fee, and that the court is to assess and, when funds exist, collect an initial partial filing fee.

146 F.3d at 612.

Alternatively, defendants submitted that plaintiff's suit fails because he cannot establish that the injury of which he complaints – dismissal of his appeal – was because of the MNDOC's mail policy. Def. Mem., p. 7. The Court agrees.

In order to prevail in this case, plaintiff must be able to prove that defendants intentionally restricted his access to the courts and that it was there actions that actually prevented him from litigating his claim with the Minnesota Court of Appeals. Accepting plaintiff's version of the facts, as this Court must do on a motion for summary judgment, there is nothing in the record which tends to show that defendants restricted plaintiff's access to the courts. For example, the record is replete with defendants' replies to plaintiff's kites instructing him how to receive the copies of his state appellate briefs from his family so that he could file them with the Minnesota Court of Appeals. Some time before May 29, 2007, plaintiff received notice that his incoming mail exceeded the sixteen-ounce limit and had been rejected on that basis; on June 13, 2007, he was informed that if he wanted to receive that particular mail, it would need to be split into packages weighing less than sixteen ounces each. McComb Aff. ¶ 13, Ex. 7. While plaintiff subsequently did have briefs broken down into six separate packages, they were still rejected presumably because each package exceeded the 16-ounce limit. See McComb Aff. ¶ 14, Ex. 8.

Additionally, plaintiff was given three separate extensions to file his brief with the Minnesota Court of Appeals, the last of which was July 23, 2007, nearly two months after he first learned about the incoming mail weight limit, and at his request, he was given permission by the Minnesota Court of Appeals to have the brief filed by a third party. See Behrens Aff., Ex. 5 (Order of Minnesota Court of Appeals dated June 21,

2007 in the state appeal).  Nevertheless, despite the granting of the extensions and his request to permit a third party to file his briefs for him, plaintiff never did have his family send the copies of his brief directly to the Minnesota Court of Appeals.

Finally, apart from the copies of his brief, without explanation, plaintiff failed to provide the Minnesota Court of Appeals with one copy of the judgment from which the appeal was undertaken.  See Behrens Aff., Exs, 2-5, 6 (Orders of Minnesota Court of Appeals dated May 8, 2007, May 29, 2007, June 12, 2007 and July 11, 2007 in the state appeal); Complaint, Ex. A (Order of the Minnesota Court of Appeals dated May 8, 2007 in the state appeal).  The appeal was ultimately dismissed because plaintiff never filed his briefs or a copy of the underlying judgment.  See Behrens Aff., Ex. 7 (Order of the Minnesota Court of Appeals dated August 2, 2007 in the state appeal).  On this record, this Court agrees that plaintiff cannot establish that the prison's mail policy was the reason his appeal was dismissed, and on that basis, recommends that defendants' motion for summary judgment be granted.

### 2.    First Amendment Claim

Next, defendants contended that MNDOC's mail policy does not violate the First Amendment because it is reasonably related to legitimate penological interests under Turner v. Safley, 482 U.S. 78 (1987).  Def. Mem., pp. 8-9.

Turner permits prison rules to restrict a prisoner's constitutional rights if they are "reasonably related to legitimate penological interests" and are not an "exaggerated response" to such objectives.  482 U.S. at 87.

> Turner sets forth four factors that courts should consider in making that determination. First, we ask whether there is a "valid rational connection" between the prison regulation and the government interest justifying it. Id. at 89-90, 107 S.Ct. 2254.  Second, we consider whether there is an

alternative means available to the prison inmates to exercise the right. Id. at 90, 107 S.Ct. 2254. Third, we examine whether an accommodation would have "a significant 'ripple effect' " on the guards, other inmates, and prison resources. Id. Fourth, we evaluate whether there is an alternative that fully accommodates the prisoner "at de minimis cost to valid penological interests." Id. at 90-91, 107 S.Ct. 2254.

Murphy v. Missouri Dep't of Corr., 372 F.3d 979, 982-983 (8th Cir. 2004), cert. denied, 125 S.Ct. 501 (2004) (quoting Turner v. Safley, 482 U.S. 81, 89 (1987)). See also Bonner v. Outlaw, 552 F.3d 673, 678 (8th Cir. 2009) (citing Turner factors).

In reconciling the competing interests of an inmate's constitutional interests and a prison's regulations, "[w]e must accord substantial deference to the professional judgment of prison administrators, who bear a significant responsibility for defining the legitimate goals of a corrections system and for determining the most appropriate means to accomplish them." Overton v. Bazzetta, 539 U.S. 126, 132 (2003). "The burden, moreover, is not on the State to prove the validity of prison regulations but on the prisoner to disprove it." Id.

The first consideration is whether there is a valid, rational connection between the prison regulation and the legitimate governmental interest put forward to justify it. "[P]rison officials may well conclude that certain proposed interactions, though seemingly innocuous to laymen, have potentially significant implications for the order and security of the prison. Acknowledging the expertise of these officials and that the judiciary is "ill equipped" to deal with the difficult and delicate problems of prison management, this Court has afforded considerable deference to the determinations of prison administrators who, in the interest of security, regulate the relations between prisoners and the outside world." Thornburgh v. Abbott, 490 U.S. 401, 408 (citing Procunier v. Martinez, 416 U.S. 396, 404-405 (1974)). "We accord great deference to

the judgment and expertise of prison officials, "particularly with respect to decisions that implicate institutional security.'" <u>Murphy</u>, 372 F.2d at 983 (quoting <u>Goff</u>, 362 F.3d at 549. This <u>Turner</u> factor requires the Court to "determine whether the governmental objective underlying the regulations at issue is legitimate and neutral, and that the regulations are rationally related to that objective." <u>Thornburgh</u>, 490 U.S. at 414.

In support of the first factor, defendants submitted that the bases for regulating the weight of non-legal mail are protecting facility security and limiting the burden on MNDOC's resources. Def. Mem., p. 11 (citing McComb Aff., ¶¶ 4-5). According to defendants, incoming non-legal mail is one of the major avenues inmates use to smuggle contraband into prisons, including drugs and money to instructions for manufacturing drugs, weapons or escape plans. <u>Id</u>. The prison mailroom processes thousands of pieces of mail per day and more during the holiday seasons. <u>Id</u>. All mail coming into prisons must be inspected for physical contraband and skimmed for contraband content, which is a time-consuming process. <u>Id</u>. To effectively prevent the introduction of contraband, the inspection process must be manageable, and so MNDOC revised its mail policy to both balance the interests of the Department and the inmates, and establish a restriction that was easily and uniformly enforced. <u>Id</u>., ¶ 5.

According to defendants, a one-pound envelope generally contains about 100 pages of paper. McComb Aff., Ex. 8 (Response from McComb dated June 19, 2007). Only a small number of inmates receive mail that weighs more than a pound, but that mail accounts for a disproportionate amount of time needed to skim and search the contents, hindering the efficiency of the mailroom staff and increasing the risk of contraband or inappropriate content entering the prison. McComb Aff., ¶ 6. The policy

has no application to legal mail or to mail inmates may send out of the prison. McComb Aff., ¶¶ 8, 10.

In response, plaintiff contended that the rationale articulated by defendants was clearly outside the scope of facility security because MNDOC's mail policy has several provisions that could have been used to allow plaintiff to receive proper notice of the revised policy before rejecting his mail and allowing him to receive his mail. Pl. Opp. Mem., pp. 2-4. According to plaintiff, his mail was not opened and checked for contraband; yet, pursuant to Directive 302.020 G (Non-Delivery of Offender Mail),[7] which provides that an inmate is supposed to be supplied notice that "unallowable mail" was not delivered and the reason for rejection, he was not informed of the rejection. Id.,

---

[7]     MNDOC Directive 302.020 G provides in pertinent part:

Non-Delivery of Offender Mail

1.     When unallowable incoming or outgoing mail is not delivered, the offender will be sent a completed Notice of Non-Delivery of Mail/Package (attached) stating the reason(s) for rejection. The offender is responsible for informing the sender of denied item(s). Notices of non-delivery will not be sent for unopened mail that was returned to the sender.

2.     Unallowable mail constituting a risk to the safety and security of the facility, specific individuals, or the general public will not be returned to the sender or intended recipient. These items may be destroyed or referred to the Office of Special Investigations for disposition. The sender and intended recipient will receive a completed Notice of Non-Delivery of Mail/package stating the reason(s) for rejection, unless it would inhibit an investigation of potential criminal behavior or other conduct in violation of facility rules.

3.     With an exception of the items noted in #2, the offender has 30 days to choose one of the following dispositions at his/her expense.

   a.  Incoming unallowable mail may be destroyed or returned to the sender with a copy of the Notice of Non-Delivery of Mail/Package; or

   b.  Outgoing unallowable mail destroyed or returned to the offender.

p. 3.  Thus, plaintiff maintained that the inconsistencies in the procedures utilized by the facility created a circumstance that made the facility's objective arbitrary and irrational and not related to a legitimate objective.  Id.

The Court finds that MNDOC's policy is rationally related to its objectives of preventing contraband from entering the prison and taking into account the finite resources of the prison.  First, the myriad problems with incoming mail and contraband are well-documented, and have formed a basis for mail restrictions.  See Weiler v. Purkett, 137 F.3d 1047, 1050 (8th Cir. 1998) (upholding prison regulation limiting receipt of packages).  Weight limits on incoming mail have also been upheld.  See Osbourne v. Johnson, 2006 WL 208587 at *2 (W.D.Va. Jan. 26, 2006) ("[I]in light of evidence that books, magazines, lengthy correspondence, and stuffed envelopes can be used to smuggle contraband into prison and a significant amount of time would be devoted to inspecting the potentially voluminous materials forwarded to the prison which have neither been ordered nor paid for by the receiving inmate, multi-page correspondence, and stuffed envelopes, a policy which permits inmates to only receive written materials ordered and paid for by that inmate and/or personal correspondence weighing no more than one ounce, does not violate an inmate's First Amendment rights.").  See also Hall v. Johnson, 224 F.Supp.2d 1058 (E.D.Va. 2002) (also upholding one-ounce weight limit as constitutional).

Second, plaintiff's reliance on MNDOC Directive 302.020 G.1 is misplaced.  That policy specifically provides that an inmate will be notified when "unallowable mail" is not delivered and the reason for rejection.  "Unallowable mail" concerns mail that has been opened and screened by mailroom staff and does not include mail that weighs more

than sixteen ounces.  <u>See</u> MNDOC Directive 302.020 F.[8]  Instead, mail that weighs

more than sixteen ounces is simply returned to the sender without being opened, but is

done so with an explanation provided <u>to the sender</u> for the rejection.  <u>See</u> MNDOC

Directive 302.020 E.2(b) (<u>supra</u> n. 1).  Accordingly, the provisions cited by plaintiff did

not apply to his mail, which weighed more than sixteen ounces.

Consequently, regarding the first element of the <u>Turner</u> analysis, the Court finds

that any infringement on plaintiff's First Amendment rights serves the legitimate

penological interest of preventing contraband from entering the prison.  "[The Eighth

Circuit has] recognized institutional security as "the most compelling governmental

---

[8]     MDOC Directive 302.020 F provides:

Unallowable Mail: Incoming and outgoing mail, in whole or in part, is not authorized if it

1.     constitutes a risk to the safety and security of the facility, specific individuals or the general public;
2.     contains contraband or pertains to sending contraband into or out of the facility;
3.     contains threats of physical harm, blackmail, extortion, suspicious messages or other criminal activity;
4.     pertains to unauthorized business activity including the practice of a profession, sale, solicitation, manufacture, or distribution of goods or services, excluding authorized hobby craft activity or routine communication with a person who is operating a business established by the offender prior to incarceration;
5.     contains information, which, if communicated, would create a threat of violence, physical harm, or a breach of facility security;
6.     solicits gifts of goods or money from a source other than family or persons on the offender's visiting list;
7.     contains photographs that include department staff;
8.     contains contents that are written in code or not understood by the inspecting staff and efforts to have mail interpreted have been unsuccessful;
9.     contains stamps, instant cash cards, phone cards, and credit cards;
10.    contains items that pose a safety or sanitation hazard, including lipstick or other foreign substance and/or has strange odors which includes perfume/aftershave; or
11.    construction of letter or envelope prohibits inspection.

interest in a prison setting.'" Goff, 362 F.3d at 549 (quoting Ochs v. Thalacker, 90 F.3d 293, 296 (8th Cir. 1996)). See also Overton, 539 U.S. at 133 ("The regulations promote internal security, perhaps the most legitimate of penological goals.").

As to the second factor – whether there are alternative means of exercising the right that remain open to prison inmates – the Court finds that such alternatives sufficiently exist.

MNDOC's weight limit only applies to an individual envelope. McComb Aff., ¶ 7. If non-legal mail weighs over sixteen ounces, the sender has the option of dividing the mail among individual envelopes weighing less than sixteen ounces. Id. That is, the inmate has the ability to still receive the same mail; it simply has to be split into envelopes, each weighing less than sixteen ounces, so that the prison mailroom may more easily inspect it. See Turner, 482 U.S. at 92 (finding that the correspondence regulation prohibiting prisoner correspondence between prisoners did not deprive prisoners of all means of expression, but rather barred communication only with a limited class of other people). Again, the restriction at issue here does not include legal mail, and as defendants observed, the limit does not affect an inmate's ability to litigate – they are still able to obtain cases through state law library staff, make photocopies, and receive non-legal mail weighing less than sixteen. Def. Mem., pp. 13-14. "Alternatives…need not be ideal, however; they need only be available." Overton, 539 U.S. at 135.

Plaintiff argued that he attempted to utilize the alternative of having his material separated into smaller envelopes, but defendants still rejected the envelopes and did not properly weigh the mail. Pl. Opp. Mem., p. 4. In this regard, plaintiff contended that

defendants should have deducted the weight of the envelopes themselves, which would have brought the weight of the contents of the envelopes within the sixteen-ounce limit. Id. Defendants responded that including the weight of the envelope does not prevent an inmate from receiving mail. Def. Reply, p. 4. Furthermore, it is rational to expect the prison to weigh the envelope and contents together as a whole, as the time and effort required to weigh each separately would only impose further inefficiency on the mailroom staff in the form of opening the mail, separating the contents from the envelope or package, and weighing each item separately.

The third factor is what impact accommodation of the constitutional right will have on guards and other inmates, and on the allocation of prison resources generally. "When accommodation of an asserted right will have a significant 'ripple effect' on fellow inmates or on prison staff, courts should be particularly deferential to the informed discretion of correction officials." Turner, 482 U.S. at 90. The Court finds that the impact of MNDOC Directive 302.020 E.2(b) on prison inmates is minimal – the regulation does not prohibit inmates from receiving mail. Rather, it only restricts receipt of mail in a single envelope weighing greater than sixteen ounces. The sender of the mail is free to split whatever is being sent into however many envelopes are necessary, with the singular requirement that each envelope must weigh less than sixteen ounces. Furthermore, MNDOC has sufficiently set forth a factual basis supporting the effect on prison security and administration if the policy did not exist. Heavier items of mail increase the risk of contraband entering the facility and require the devotion of more staff and resources to screen incoming mail. See McComb Aff. ¶¶ 4, 6. See Overton, 539 U.S. at 135 (citing Turner, 482 U.S. at 90) ("Accommodating respondents' demands

would cause a significant reallocation of the prison system's financial resources and would impair the ability of corrections officers to protect all who are inside a prison's walls. When such consequences are present, we are 'particularly deferential' to prison administrators' regulatory judgments.").

In opposition, plaintiff asserted that allowing him to receive legal documents that are less than sixteen ounces, excluding cardboard envelopes, would have no meaningful impact on the mailroom staff.  Pl. Mem., p. 5.  But plaintiff provided no evidence to contradict the facts submitted by defendants to support their claim that a policy without a weight restriction on incoming non-legal mail impacted both security and resources of the prison.  In any event, plaintiff's argument has no application where in this instance the mailings to plaintiff did not constitute legal mail within the definition set forth by the prison because they were sent by family members.  And as discussed above, it is rational to expect the prison to weigh the envelope and contents together as a whole.

Finally, the fourth factor is whether there are ready alternatives for furthering the government interest available.

> This is not a 'least restrictive alternative' test: prison officials do not have to set up and then shoot down every conceivable alternative method of accommodating the claimant's constitutional complaint. But if an inmate claimant can point to an alternative that fully accommodates the prisoner's rights at de minimis cost to valid penological interests, a court may consider that as evidence that the regulation does not satisfy the reasonable relationship standard."

Turner, 482 U.S. at 90-91.  See also Overton, 539 U.S. at 136 ("Turner does not impose a least-restrictive-alternative test, but asks instead whether the prisoner has pointed to some obvious regulatory alternative that fully accommodates the asserted right while

not imposing more than a de minimis cost to the valid penological goal.").

According to defendants, no ready alternative exists because changing the policy would impose a more than de minimus cost on MNDOC, and eliminating the policy would revert back to a policy that unduly burdened mailroom staff and created a heightened risk of compromising facility security.  Def. Mem., p. 15.  Plaintiff contended that defendants have existing alternatives in MDOC Policies 302.020 G and 302.020 H.[9] Pl. Opp. Mem., pp. 5-6.  Specifically, plaintiff pointed to a provision offering 30 days to choose disposition of mail.  See Id., p. 5.

Both MNDOC Directives 302.020 G and 302.020 H concern unallowable offender mail.  MNDOC Directive 302.020 G provides notice to the inmate when unallowable mail is not delivered to him.  It also grants the inmate 30 days to choose a disposition of unallowable mail, which results in the destruction or return of the unallowable mail to the

---

[9]    MNDOC Directive 302.020 G is set out in footnote 7, supra.  MNDOC Directive 302.020 H provides in pertinent part::

Review of Unallowable Offender Mail

1. The warden/superintendent will appoint a correspondence review authority to review actions regarding offender mail, including published materials.  The correspondence review authority will consist of one or more staff who does not have responsibility or control over normal handling of the mail.
2. Offenders may request a review of decisions regarding unallowable mail by sending a kite to the mailroom supervisor within 15 days of receipt of the Notice of Non-Delivery of Mail/Package.  A written response from the mailroom supervisor providing a decision and rationale will be sent to the offender within ten days of the receipt of the offender's request, excluding weekends and holidays.
3. Offenders may request a subsequent review by the correspondence review authority within 15 days of receiving the mailroom supervisor's decision.  The authority will provide a written decision and rationale within ten days of receipt of the offender's request, excluding weekends and holidays.  The decision of the authority is final.

sender.  MNDOC Directive 302.020 H allows for review of decisions regarding the non-delivery of unallowable mail.  Even if the prison were to give the inmate notice that a letter weighing in excess of sixteen ounces had been rejected and either 30 days to choose disposition of the mail, or 15 days to request of review of the decision to reject the mail, one of the principal goals of the mail policy would be compromised – the efficiency of the mailroom at the prison.  The mailroom would have to set aside any mail weighing more than sixteen ounces, notify the prisoner of its existence and that it had not been delivered because of its weight, perform what the mail policy seeks to circumvent in the first place – review the contents of the envelope for contraband to see if the mail was allowable or unallowable – and then permit the prisoner to request review of the decision.  This is not a valid alternative to the policy at issue.  It is precisely the situation sought to be remedied by the policy: to limit the disproportionate amount of time and resources devoted to skimming and searching the contents of mail received by a few number of inmates that exceed sixteen ounces.[10]  Plaintiff's "alternative" is no alternative at all.  It is simply a repeal of the policy.  Accordingly, the alternatives suggested by plaintiff impose a more than de minimus cost on the prison.

In summary, the Court finds that all of the Turner factors favor defendants, and that the mail policy requiring incoming mail to weigh less than sixteen ounces is "reasonably related to legitimate penological interests."  Turner, 482 U.S. at 78.

### 3.    Procedural Due Process Claim

Throughout plaintiff's responsive memorandum, plaintiff raised for the first time

---

[10]    The fact is that once the incoming mail weighs in at less than sixteen ounces, it will be reviewed to determine if it is allowable or unallowable, and all of the protections afforded by MNDOC Directives 302.020 G and 302.020 H will kick in.

as a basis for defeating defendants' motion, claims that he did not receive notice of the revised mail policy, or notice that his incoming mail had been returned to the sender. Pl. Mem., pp. 3, 6, 8, 10-11.  Although plaintiff did allege a violation under the Fourteenth Amendment in his first cause of action, he framed this claim as a denial of access to the courts and not as a procedural due process claim.  Accordingly, even though plaintiff did not allege in his Complaint lack of notice of the adoption of the revised mail policy or lack notice that his mail had been rejected (much less assert a procedural due process claim), for completeness and in recognition of plaintiff's pro se status, the Court will address these contentions.

a.  Notification of Revised Mail Policy

Revised MNDOC Directive 302.020 was issued on April 3, 2007, and became effective on May 1, 2007.  McComb Aff., Ex. 2.  Accordingly, defendants contended that MNDOC issued the new policy nearly one month before it became effective, and was accessible to inmates pursuant to Directive 100.100.[11]  Reply, p. 6 (citing

---

[11]  MDOC Directive 100.100 (Policy Manual Maintenance) provides in pertinent part:

New and revised policies and division directives are posted monthly with the approval of the affected divisions.  The department Policy Coordinator posts new or revised policies and division directives on the department website prior to implementation.  In the event of an emergent or critical function issue, policies and division directives may be issued and put into effect on the same day.  The department Policy Coordinator posts new and revised instructions and security instructions on the effective date.

Policies, division directives and instructions are accessible to all department employees, offenders, and the public.  Security instructions, post orders, and operating guidelines are accessible to department employees only.  Single units within central office, field offices and all correctional facilities may write instructions, security instructions, operating guidelines or post orders as needed to implement policies and division directives.

www.doc.state.mn.us/DocPolicy2/html/DPW_Display_TOC.asp?Opt=100.100.htm).    In
response, plaintiff maintained that there was no prior notice posted in the living units or
in a conspicuous place for inmates to be informed of the revised policy.   McKenzie Aff.,
¶ 13.

Due process requires that a prisoner be given some advance notice of the
prison's rules and regulations.  See Meis v. Gunter, 906 F.2d 364, 367 (8th Cir. 1990)
("obvious problems of due process arise" if "[t]here has been no fair notice of what is
prohibited"), cert. denied, 498 U.S. 1028 (1991); Wolff v. McDonnell, 418 U.S. 539, 563-
64 (1974) (before a prisoner can be charged with violating prison rules, the prisoner
must have notice of those rules).

According to plaintiff, the new policy was never posted in the prison.   According
to defendants, it was posted in accordance with MNDOC Directive 100.100.   Directive
100.100 mandates that policies be accessible to all offenders, and states that directives
are posted monthly with the approval of the affected divisions and are posted on the
department website prior to implementation.   However, the Court has no evidence
before it to determine whether indeed MNDOC Directive 302.020 was posted, when it
was posted, where it was posted, and if posted on its website, whether inmates such as
plaintiff had access to the website.   Lacking such information, this Court cannot
conclude that the posting of the revised mail policy met the requirements of due
process.   Compare Radi v. McCormick, 978 F.2d 715 at *1 (Table) (9th Cir. 1992)
(posting prison rules and regulations using inmate orientation, rule books available in
the prison library and guard offices, the orientation handbook, and the prison newspaper

http://www.doc.state.mn.us/DOcpolicy2/html/dpw_main.asp?opt=IE.

sufficiently met the requirements of due process by posting and otherwise making available the rules); <u>Minnesota Civil Liberties Union v. Schoen</u>, 448 F.Supp. 960, 967 n.2 (D.Minn. 1977) (advising inmate of prison's change in inmate mail regulations through publication in institution's inmate newspaper was an appropriate means advising the inmates).

Nonetheless, posted or not, what is not in dispute is that plaintiff had received notice of the revised mail directive by the time he made his first request for an extension to file his briefs with the Minnesota Court of Appeals, and filed his first kite with prison officials. The undisputed facts show that at plaintiff's request, on May 29, 2007, the Minnesota Court of Appeals entered an order granting him an extension of time to file his brief until June 15, 2007. Behrens Aff., Ex. 3 (Order of Minnesota Court of Appeals dated May 29, 2007 in the state appeal). In this Order, the Court of Appeals stated that the basis for plaintiff's request for an extension was that the filing of his brief had been delayed because he was not allowed to receive the copies of his brief, due to a restriction on the weight of incoming mail. <u>Id.</u>, p. 1. Two days later, on May 31, 2007, plaintiff filed an informal grievance with defendant McComb, stating he had been informed by the mailroom that his incoming legal mail was rejected and returned to the sender due to "a D.O.C. Policy that stipulates inmates cannot receive mail over 16 oz. in weight." Complaint, p. 3; Ex. C (Offender Kite Form dated May 31, 2007 and response dated June 4, 2007 and Informal Grievance dated May 31, 2007); McComb Aff. ¶ 11, Ex. 4 (same). Then, citing to MNDOC Directive 302.020 E.2(b), plaintiff referenced the extension he had received from the Minnesota Court of Appeals to file his brief with the. <u>Id</u>.

What is clear from this evidence is that no later than May 31, 2007, plaintiff was on notice of the revised mail policy. See <u>Anderson v. Solomon</u>, 2005 WL 3357182 at *1 (N.D.Fla. Dec. 9, 2005) ("Whether or not the rules and regulations were sufficiently available to [inmate] need not be addressed by the Court, for evidence from the record indicates that [inmate] had actual knowledge of the specific rule in question which he admits to having violated.").

Furthermore, plaintiff was given until July 23, 2007 by the Minnesota Court of Appeals to address his filing problems, which was ample time to obtain the copies of his brief he needed and file them with the Court of Appeals. Therefore, while plaintiff may have learned of the revised mail policy at the same time the mail room first rejected his briefs, and not before, it is apparent that he did have notice of the policy more than two months before the Court of Appeals finally dismissed his appeal. On this record, the Court finds no merit for plaintiff's argument that his failure to timely file his briefs with the Court of Appeals was due to his lack of notice of the revised mail policy.

Similarly, plaintiff's contention that he did not receive notice that his mail had been returned to the sender fails under the facts presented by the parties. Under MNDOC's policy, plaintiff was not required to be given notice that his mail was returned to the sender. Rather the policy stated that it is the sender who shall receive the explanation as to why his or her mail has been returned. See MNDOC Policy 320.020 E.2(b).

Prisoners have a protected liberty interest in communication by mail and their due process rights are implicated where they do not receive notice that their mail has been rejected. See <u>Bonner v. Outlaw</u>, 552 F.3d 673, 676 (8th Cir. 2009).

In Procunier v. Martinez, the Supreme Court held "[t]he interest of prisoners and their correspondents in uncensored communication by letter, grounded as it is in the First Amendment, is plainly a 'liberty' interest within the meaning of the Fourteenth Amendment even though qualified of necessity by the circumstance of imprisonment." 416 U.S. 396, 417, 94 S.Ct. 1800, 40 L.Ed.2d 224 (1974), overruled on other grounds by, Thornburgh v. Abbott, 490 U.S. 401, 109 S.Ct. 1874, 104 L.Ed.2d 459 (1989). As such, "the decision to censor or withhold delivery of a particular letter must be accompanied by minimum procedural safeguards." Id. The Court approved a requirement that an inmate be notified of the rejection and have a reasonable opportunity to protest the decision, concluding such requirements "do not appear to be unduly burdensome." Id.

Id.

"[T]he case law is clear that an inmate has a right to procedural due process -- including notice -- whenever any form of correspondence addressed to that inmate is rejected." Id. at 678. Further, notice to the sender of the rejection and the reasons for rejection does not meet the requirements for procedural due process. Id. At the same time, however, "a person cannot complain about the constitutionality of the method used to provide notice when he or she has received actual notice (assuming it is timely), for he or she has suffered no harm." Nunley v. Department of Justice, 425 F.3d 1132, 1139 (8th Cir. 2005).

Even if this Court were to find that MNDOC Directive 303.020 E.2(b) does not pass constitutional muster because it does not require notice to the inmate that his mail had been rejected, the facts establish that in this case plaintiff did receive notice from the mailroom that that his incoming legal mail had been rejected and returned to the sender due to "a D.O.C. Policy that stipulates inmates cannot receive mail over 16 oz. in weight." Complaint, p. 3; Ex. C (Offender Kite Form dated May 31, 2007 and response dated June 4, 2007 and Informal Grievance dated May 31, 2007); McComb Aff. ¶ 11, Ex. 4 (same). Accordingly, where plaintiff did receive the notice required by law, he

cannot make out a procedural due process violation. Stated otherwise, the injury of which plaintiff complains– the actual returning of his incoming mail to the sender – was the consequence of the enforcement of the revised policy to him and not the failure to notify plaintiff that his mail had been rejected.

For all of these reasons, a procedural due process claim premised on the Fourteenth Amendment fails.

## III.    CONCLUSION

In summary, the Court concludes that summary judgment in favor of defendants is appropriate because plaintiff has not established that MNDOC's revised mail policy denied him access to the Minnesota Court of Appeals.  Not only has plaintiff failed to show that it this policy lead to his failure to timely file his papers with the state appellate court, but even if he had made such a showing, this Court finds that the mail policy is "reasonably related to legitimate penological interests" and are not an "exaggerated response" to such objectives. Turner, 482 U.S. at 87.  Further, to the extent that plaintiff attempted to raise a procedural due process claim by alleging that he did not have notice of the revised mail policy or notice that his mail had been rejected prior to deadline for filing his papers with the Minnesota Court of Appeals, the undisputed facts do not support such a claim.  The record before this Court establishes that plaintiff was on notice of the revised mail policy and its application to him well in advance of the final deadline given to him by the Minnesota Court of Appeals to submit his briefs and the judgment of the trial court.  His appeal was dismissed not because of the actions of defendants, but for failure to comply with the appellate court's directive.  For all of these reasons, it is recommended that defendants' motion for summary judgment be

granted.[12]

## **RECOMMENDATION**

For the reasons set forth above and based on all the files, records, and proceedings herein, IT IS RECOMMENDED that:

Defendants' Motion for Summary Judgment [Docket No. 19] be **GRANTED**.


Dated:        August 13, 2009

*s/ Janie S. Mayeron*
JANIE S. MAYERON
United States Magistrate Judge


Under D.Minn. LR 72.2(b) any party may object to this Report and Recommendation by filing with the Clerk of Court, and serving all parties by **August 31, 2009**, a writing which specifically identifies those portions of this Report to which objections are made and the basis of those objections. A party may respond to the objecting party's brief within ten days after service thereof. All briefs filed under this Rules shall be limited to 3500 words. A judge shall make a de novo determination of those portions to which objection is made. This Report and Recommendation does not constitute an order or judgment of the District Court, and it is therefore not appealable directly to the Circuit Court of Appeals.

---

[12] Defendants' motion for summary judgment also argued that plaintiff failed to allege personal involvement by defendants Fabian and Dingle, that plaintiff was not entitled to the relief damages he seeks because he could not recover money damages from the State, and that even if he could establish a constitutional violation, all defendants were entitled to qualified immunity. Def. Mem., pp. 5-17. Because the Court has determined that plaintiff cannot establish that mail policy denied him a constitutional right of access to the courts, and that MNDOC's the Department of Corrections' mail policy does not violate the First Amendment, the Court does not reach the remainder of defendants' arguments.